THE TOWN OF BROWNINGTON *v.* THE TOWN OF CHARLESTON.

*Pauper.*

In order to sustain a proceeding for the *removal* of a pauper, he must have gone to the town, asking for the removal, with the intention of remaining there, or have formed that intention after arriving there. If such be not the case, the remedy is an action of assumpsit for the support of the pauper, as a transient person, under sec. 16, chap. XVIII, p. 133 Comp. Stat.*

The town of C. being chargeable for the support of a pauper, upon the removal of the person with whom the pauper resided, from C. to the town of B., contracted with such person to support the pauper in B. for a certain time; and under this agreement the pauper removed from C. to B. with such person; *Held*, that neither such a removal under the circumstances, nor the fact that the pauper had remained in B. for about ten months after the time for which the town of C. agreed to support him there, constituted such a *going to B. to reside*, as would sustain an application by that town for an order of removal,

* NOTE.—A person *non-compos* can not be said to go to a town *to reside*, so that an application for his removal can be sustained. He is to be regarded merely as a transient person in any other town than that in which he has his legal settlement; *Ryegate* v. *Wardsboro*, Caledonia County Supreme Court, 1857, not reported.—REPORTER.

it appearing that the pauper remained there through inability, on account of poverty, to leave; but that the proper remedy was an action of assumpsit by B. against C. for the expenses of the pauper's support as a transient person.

ASSUMPSIT to recover expenses incurred for the support of one Joseph Burrows, a pauper. Plea the general issue and trial by the court in Orleans county, at the June Term, 1858,— POLAND, J., presiding. The following facts were found by the court:

The legal settlement of the pauper was in Charleston, and that town had aided him occasionally prior to November, 1855, for a year previous to which time he had been residing with his son, Hiram Burrows, in Charleston. On the first of November, 1855, Hiram Burrows removed from Charleston to Brownington to reside, and notified the authorities of Charleston that they must take care of his father. In reply to this notice the selectmen of Charleston requested him to remove his father to Brownington with him and to keep him there till the next spring, and promised to pay him fifty dollars for so doing. Hiram Burrows accordingly removed his father, his father's wife and one child to Brownington, and they lived there by themselves in a house belonging to Hiram, by whom they were mainly supported during the winter.

About the first of March, 1856, the overseer of Charleston settled up with Hiram Burrows for his father's support and told him he must make a new contract with the new overseer. After this the town of Charleston refused to furnish any further aid or support for Joseph Burrows, though several times applied to by him after the first of March, and he, with his wife and child, continued to live in the house of Hiram Burrows, where he had lived, and did something toward the support of his family by making baskets, and had a small garden, the residue of his support being furnished by his son Hiram and the charity of the neighbors. He continued to live in this way until January, 1857, when application was made to the town of Brownington for aid, and they furnished the supplies now sought to be recovered, being about seventeen dollars, which were needed and reasonable. Upon the above facts the court adjudged that the plaintiffs were entitled to recover, to which the defendant excepted.

*J. E. Dickerman*, for the defendant.

*Timothy P. Redfield*, for the plaintiff.

ALDIS, J. The town of Charleston is liable for the support of the pauper, Burrows. But Burrows, being in Brownington, called on that town for support. Upon this case Brownington had to decide which one of two courses to adopt. First, if the pauper had come to reside in Brownington, these proceedings must be had under the statute to obtain an order of removal, and without such a proceeding nothing could be recovered of Charleston for the expense of supporting the pauper. But if Burrows had not " come to reside " in Brownington, if he was only a transient person there, then the proper course would be, not to proceed for an order of removal, but to furnish the pauper a support, and sue and recover therefor of Charleston in assumpsit. The plaintiff decided to pursue the latter course and hence this action. The right to recover depends upon the pauper's being a transient person ; if he had *come to reside* in Brownington there can be no recovery in this suit.

The question whether a pauper has come to reside in a town is one of fact. Two things are necessary to show such a residence ; first, he must have come to the town *actually*, not by mere intention or constructively ; secondly, he must have come there *animo manendi*, or being there he must intend to remain there, and must have abandoned all intention of returning to the town whence he came. Hence the intention, whether of remaining or of returning, gives character to the actual tarrying in the place, and determines whether it is or is not residence. This intention is ascertained by evidence of the attending circumstances and of the acts and declarations of the party. In the case at bar the court has set forth in the bill of exceptions the acts of the pauper and the circumstances under which he came to and stayed in Brownington, and upon these facts has decided the plaintiff can recover, or what is the same thing that the pauper did not come to reside in Brownington. If the evidence tended to show this, this court cannot say there was error in the decision.

I. Of the original coming of the pauper to Brownington. This was by a removal of the pauper by the direction of the

defendant town to Brownington, upon an agreement to support him till the first of the then next March. He was removed in November. He remained in Brownington till the first of March supported by Charleston. Up to this time it is clear that the removal and the remaining of the pauper in Brownington was in no proper sense a residence in Brownington or a coming to reside there. It was a stay there ostensibly for a temporary purpose, viz., to live with his son at Charleston's expense till the first of March It was not a voluntary removal by the pauper, but a *necessity* to go where Charleston would furnish him a support. It showed no intent to remain in Brownington and to abandon Charleston, but on the contrary, the mere animal instinct to cling to his support where he could get it. Such a removal and residence under it are analogous to the residence of a person imprisoned, and are not in a legal sense residence, but only the stay of a transient person ; *Manchester* v. *Rupert*, 6 Vt. 291 ; *Danville* v. *Putney*, 6 Vt. 512. It was on a similar principle that this court held in *Ryegate* v. *Wardsboro*, decided in 1857, but not reported, that fourteen years' residence of one *non compos* did not make a residence, because the *intent*, the *animus manendi* could not be predicated of such a person. Till the first of March there was nothing tending to show an intent of any kind on the part of the pauper. Others intended for him and controlled his residence. There was nothing to prove that he did not intend to return to Charleston, or that he did intend to reside in Brownington ; *Woodstock* v. *Hartland*, 21 Vt. 563 ; *Sutton* v. *Cabot*, 19 Vt. 522, illustrate how coercion or necessity, by taking away the intention of remaining, take away from residence the essential element of its existence as a legal residence under the statute.

II. It is claimed that the residence of the pauper from March to January, and the attending circumstances show a legal residence.

The living in a house by himself and contributing somewhat to his own support, and staying the length of time he did were circumstances tending to show an intent to reside there But we cannot deem them conclusive. There were other circumstances tending to explain his stay, and to show that it was in part from a necessity growing out of his poverty and the misconduct of the defendant, and in part that the intent to return to Charleston

always existed, and was never abandoned, and failed to be put into action through the wrongful acts of the defendant.

The overseer of Charleston about the first of March told the son he must make a new contract for the support of his father with the new overseer. This may have prolonged his stay. So the inability of the pauper from poverty to return, his risk of suffering in going back to a town that refused to support him, his having no home or place in Charleston to go to for even a temporary shelter, connected with the character of his original removal, these tended to explain his remaining in Brownington as being from necessity, not choice or intention. So his frequent applications to Charleston for support showed the *animus revertendi* to still exist. He clung to all the home he had, the legal liability of Charleston to support him. He did something towards returning there, for by asking their aid he indicated a willingness to go where it was usually furnished, and where only the town was bound to furnish it, viz., within their limits. Had there been no evidence that the residence was temporary, by necessity, and with the intention to return, then it would have been error in the county court to have given judgment for the plaintiff. But as the evidence, taking the view the most favorable to the defendant, was at least conflicting on the point, we cannot hold it error that the court below drew an inference from the evidence which it legally tended to prove.

Judgment affirmed.